**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**MARCTEC, LLC,**

     **Plaintiff/Counterclaim Defendant,**

**v.**

**JOHNSON & JOHNSON and
CORDIS CORPORATION,**

     **Defendants/Counterclaim Plaintiffs.**     **Case No. 07-cv-825-DRH**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
FINDING THIS CASE EXCEPTIONAL AND AWARDING
<u>DEFENDANTS' REASONABLE ATTORNEYS FEES AND EXPERT FEES</u>**

**HERNDON, Chief Judge:**

     This matter came before the Court on the Motion, pursuant to 35 U.S.C. § 285 and Rule 54 of the Federal Rules of Civil Procedure by defendants Cordis Corporation and Johnson & Johnson (collectively, "Cordis"), to (1) declare this case exceptional and (2) award Cordis its reasonable attorneys fees and expert fees and expenses for defense of this action after a decision granting Cordis summary judgment of noninfringement.  D.I. 201.  After consideration of that motion and subsequent briefing (D.I. 205, D.I. 215), the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.      On June 15, 2009, this Court granted Cordis's motion for summary judgment of noninfringement with respect to all asserted claims of the patents-in-suit.  D.I. 178.

2.      On September 24, 2009, final judgment was entered in favor of Cordis and against MarcTec, L.L.C. ("MarcTec") on MarcTec's claims and on Cordis's counterclaims for a declaratory judgment of noninfringement; Cordis's counterclaims for a declaratory judgment of invalidity were dismissed without prejudice.  D.I. 222.

3.      As the prevailing party, Cordis has moved to have MarcTec's suit declared exceptional under 35 U.S.C. § 285 and to be compensated for its reasonable attorney and expert fees and expenses for the defense of this action.  D.I. 201.  If the Court determines that this case is exceptional under § 285, while MarcTec certainly disputes such a finding, and further states that any alleged malfeasance in this case does not warrant a $4 million award, it does not specifically dispute the reasonableness of Cordis's attorney fees and expenses in defending this case. Similarly, MarcTec does not dispute the reasonableness of the expert fees and expenses incurred by Cordis.  D.I. 205.  Thus, the main issue before this Court is whether MarcTec's suit is exceptional under 35 U.S.C. § 285.  For the reasons set forth below, the Court finds that it is.

## I.     The Patents-in-Suit

4.     This patent infringement case concerns two patents issued to Dr. Peter Bonutti, U.S. Patent Nos. 7,217,290 and 7,128,753 (the "patents-in-suit") entitled "Surgical Devices Containing a Heat Bondable Material With a Therapeutic Agent" and "Surgical Devices Having a Polymeric Material With a Therapeutic Agent and Methods for Making Same."  Dr. Bonutti's company, plaintiff MarcTec, owns these patents.

5.     As previously described in this Court's opinion on claim construction, the patents-in-suit share a common specification and concern surgical devices.  D.I. 175 at 4.  As this Court has stated, the specification "discloses only surgical devices such as hip and knee implants and suture anchors" and does not disclose non-surgical devices such as intraluminal coronary stents.  *Id.* at 8.  In addition, "the specification does not discuss or disclose solution casting . . . ."  *Id.*  As this Court held, "[h]eat bonding is the only form of bonding taught by the patent."  *Id.* at 22.

6.     In 2002 and 2003, Dr. Bonutti filed with the U.S. Patent & Trademark Office ("PTO") the applications that led to the patents-in-suit.  These applications claimed priority from Dr. Bonutti's 1990 patent application entitled "Surgical Devices Assembled Using Heat Bondable Materials."  D.I. 70, Ex. I.

7.     As this Court previously found, during prosecution of the patents-in-suit, the patent examiner "rejected Dr. Bonutti's proposed claims as invalid over U.S. Patent No. 5,102,417 ("the '417 patent"), which issued to Dr. Julio Palmaz . . ., the inventor of the balloon-expandable coronary stent."  D.I. 178 at 4; *see also* D.I. 175

at 9.  This Court found that, in response to this rejection "Dr. Bonutti represented to the PTO – and thus the public – that his invention did not include intraluminal grafts (*i.e*, stents), and further, that his invention is directed to devices for use in surgical applications, in contrast to Palmaz's balloon-expandable stent, which is not a surgical device."  D.I. 178 at 5; *see also* D.I. 175 at 9-10.

8.    As this Court also found, Dr. Bonutti further distinguished his idea from Dr. Palmaz's '417 patent by telling the PTO that his invention was different "because [it], unlike the device described by Dr. Palmaz, has a material bonded to it by the application of heat."  D.I. 178 at 5; *see also* D.I. 175 at 10.  As this Court explained, "[t]here is no heat used to bond the coating of the stent in the '417 patent.  Dr. Bonutti relied on this difference to differentiate his invention from Palmaz, and thus, to obtain allowance of his claims."  D.I. 175 at 10; *see also id*. at 11-12.  Dr. Bonutti also amended the patent claims to highlight this distinction and to require that the material bonded to the implant "is non-flowable and non-adherent at room temperature and becomes flowable, tacky, and adherent upon the application of heat."  *Id*. at 10-11; *see also* D.I. 178 at 6.  As the Court found, "[t]his amendment made clear that Dr. Bonutti's invention required the application of heat to a heat bondable material to cause that material to transform from one state (non-flowable and non-adherent) to a different state (flowable, tacky and adherent)."  D.I. 175 at 11; *see also* D.I. 178 at 6-7.

## II.     MarcTec's Complaint

9.      As this Court has recognized, the specification and prosecution history make clear that "the patents-in-suit are unrelated to stents," D.I. 175 at 8; *see also id*. at 4-5, and that "Dr. Bonutti represented to the PTO – and thus to the public – that his invention did not include intraluminal grafts (*i.e.* stents) …." D.I. 178 at 5; *see also* D.I. 175 at 9-10.

10.     Notwithstanding these facts, Dr. Bonutti's company (MarcTec) alleged in this case that Cordis's Cypher stent infringes the patents-in-suit.  The Cypher stent is a stent using technology invented by Dr. Palmaz – the same technology that Dr. Bonutti disclaimed to obtain allowance.

## III.     MarcTec's Claimed Damages

11.     The Cypher stent was launched in the United States in 2003.  It has generated billions of dollars in annual sales.

12.     In this case, MarcTec sought damages totaling hundreds of millions of dollars.  For the period from October 2006 (the date the '753 patent issued) to October 2008 (the date of MarcTec's damages report), it sought damages of $168 million.  D.I. 201, Ex. A ¶¶ 5-7; D.I. 187, Ex. 2A.  MarcTec sought additional damages on Cypher's sales up to December 2011, when the last of the patents-in-suit expires.

## IV.     Cypher's Manufacturing Documentation Shows No Heat Bonding

13.     As noted above, Dr. Bonutti amended his claims during patent prosecution to make clear that his invention required the application of heat to a

heat-bondable material to cause that material to transform from one state (non-flowable and non-adherent) to a different state (flowable, tacky, and adherent). Documents produced to MarcTec in discovery show that Cypher's polymer/drug coating is applied and adheres at room temperature without the use of heat. D.I. 187, Ex. 1 (Declaration of Michael J. Timmons) at ¶¶ 9-10, 13, Exs. A, D.

14.    By letter dated June 25, 2008, Cordis advised MarcTec that it would move for early summary judgment of noninfringement on the grounds that the Cypher stent does not infringe any of the asserted claims because it is a stent and because its coating is applied at room temperature and does not bond by the application of heat. *Id*. ¶ 16, Ex. G.

15.    On July 18, 2008, Cordis moved for summary judgment of noninfringement on these grounds. D.I. 68.

**V.    MarcTec's Mischaracterizations of the Facts and Law**

**A.    Claim Construction**

16.    As the Court found based on its review of the intrinsic record, the claims of the patents-in-suit require heat bonding and do not cover stents. In its briefing on claim construction, MarcTec urged the Court not to construe disputed claim language, or in the alternative, asked for a construction that repeated the claim language verbatim (*e.g.*, "surgical device" should be not construed or it should be construed as "surgical device"), with no further guidance as to the terms' meaning or scope in light of the intrinsic record. D.I. 72 at 2, 7, Exs. C-D; MarcTec's 2/11/09 Proposed Findings and Conclusions on Claim Construction at 20. This approach

was at odds with Federal Circuit precedent, which makes clear that the claim construction should reflect "the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*)).

17.    MarcTec also argued that the specification need only be consulted if there is an "ambiguity" in the claim language.  MarcTec's 2/11/09 Proposed Findings and Conclusions on Claim Construction at 20.  The Federal Circuit has rejected this approach and held that the specification is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1320-21 (citation omitted).  At oral argument, MarcTec conceded that *Phillips* governed and that – contrary to the positions taken in its briefs – the Court has an obligation to construe disputed claim language.  D.I. 177 at 159-60.  Even so, MarcTec offered no proposed construction for the disputed claim language and argued that a verbatim repetition of the claim language was the correct construction.

**B.    Dr. Palmaz's Stent**

18.    MarcTec also asserted that Dr. Bonutti's claims cover stents even though the claim construction adopted by the Court specifically "exclude[s] the 'expandable intraluminal vascular grafts' that Dr. Palmaz disclosed and Dr. Bonutti disclaimed." D.I. 178 at 22; *see also* D.I. 108 at 9-12.  Specifically, MarcTec argued that the stent

Dr. Palmaz described as an "expandable intraluminal vascular graft" is not a stent. D.I. 108 at 11-12. It also argued that Dr. Palmaz's "'expandable prosthesis for a body passageway' is *not* for inclusion in a blood vessel, and thus cannot be a coronary stent." D.I. 108 at 12 n.11 (emphasis in original); *see also* D.I. 178 at 22.

19.   As this Court held, MarcTec's argument "mischaracterizes Dr. Palmaz's invention, and is in conflict with admissions from MarcTec's own witnesses." D.I. 178 at 22. The Court found that the terms "intraluminal vascular graft" and "expandable prosthesis" in the Palmaz patents refer to Dr. Palmaz's invention of a balloon-expandable stent. D.I. 175 at 9, 16; D.I. 178 at 23. This Court also noted that the Federal Circuit and numerous district courts have recognized that the device disclosed in the Palmaz patents is a stent. D.I. 178 at 23; ***see, e.g., Cordis Corp. v. Medtronic AVE, Inc.*, 511 F.3d 1157 (Fed. Cir. 2008)**. Nonetheless MarcTec argued that Dr. Palmaz's invention is not a stent.

### C.   MarcTec's Facilitation Evidence

20.   This Court construed the phrases "a polymeric material bonded to the implant" and "a first component bonded to at least a portion of the tubular member" to require that the material is bonded to the implant or tubular member "by the application of heat." D.I. 175 at 26; *see also* D.I. 178 at 30. Cordis does not bond Cypher's polymer/drug coating to the device by the application of heat. It uses solution casting. D.I. 178 at 11-12. However, as this Court held, "MarcTec mischaracterize[d] the claim construction adopted by the Court as merely requiring the use of heat to 'facilitate the bonding of the polymeric material to the stent.'" *Id*.

Page 8 of 23

at 31.  As the Court stated, "[u]nder its incorrect 'facilitation' standard, MarcTec relie[d] on any step that involves heat regardless of what, if anything, is being heated and whether it causes the polymers to bond to the device." *Id.* at 32.  Thus, MarcTec pointed to the use of heat in manufacturing steps that occurred long before or after the application of the polymers to the stent and that have nothing to do with bonding the polymers to the device.  *Id.* at 38-43.  This Court excluded expert testimony premised on this mischaracterization of the claim construction as inadmissible under ***Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579 (1993)** and **FED. R. EVID. ("FRE") 702** because it "d[id] not address the requirements of the Court's claim construction and is irrelevant to the question of infringement." *Id.* at 38-39.  The Court also held that MarcTec's "facilitation" evidence was inadmissible because MarcTec "failed to provide any 'valid scientific connection' between the use of heat in manufacturing steps that occur before or after the polymers are bonded to the stent and any fact in dispute." *Id.* at 42 (citing *Daubert*, 509 U.S. at 591-92).

## VI.    MarcTec Relied Upon Inadmissible Expert Testimony

21.    As this Court found – and as evident from documents provided to MarcTec early in discovery – "[t]he placing of polymers and drug on the Cypher stent occurs entirely at room temperature."  D.I. 178 at 11-12; *see also id.* at 13-16. Moreover, as this Court found based on the testing of MarcTec's and Cordis's experts, "Cypher would have to be exposed to temperatures above 62ºC (144ºF) for these polymers to change their state and become flowable and tacky." *Id.* at 15.  The

Court also found that the polymers are "never exposed to such temperatures." *Id.* at 15. As a result, as discussed in the Court's summary judgment opinion, "it is not scientifically possible for the polymers in Cypher to be bonded to the Cypher stent by the application of heat" in the process used to manufacture Cypher. *Id.* at 16.

22.    In opposing Cordis's summary judgment motion, MarcTec relied on expert testimony for the proposition that the bonding of polymers to the Cypher stent is facilitated by the application of heat. In its decision granting summary judgment of noninfrigement, this Court excluded the expert theories and experiments proffered by MarcTec in support of this proposition as not meeting the relevance and reliability requirements of *Daubert* and FRE 702. *Id.* at 33-51.[1]

23.    In particular, as discussed in detail in the Court's summary judgment opinion, MarcTec's expert opinions were based on an "untested and untestable theory that is neither reliable nor relevant to the issues at hand" and on experiments "performed under extreme experimental conditions unrelated to the actual manufacture of the Cypher stent." *Id.* at 35-36. This Court found that MarcTec relied on an untested and untestable theory from its expert Dr. Paul Sojka "that spraying droplets at an unrealistic speed, approaching the speed of sound (and unrelated to anything that happens in the Cypher coating process) would increase the temperature of the droplets – in ways that cannot be measured – for 5 millionths of a second (0.000005 seconds) . . . ." *Id.* at 35; *see also id.* at 33-35. The Court found

---

[1]  The Court notes that in its Order (Doc. 178) granting Defendants' Motion for Summary Judgment of Noninfringement (Doc. 68), it found as moot Defendants' *Daubert* Motion to Exclude Testimony by Plaintiff's Experts (Doc. 114).

that MarcTec's expert Dr. Sojka reached his opinion without "know[ing] anything about the Cordis spray process, including the actual droplet velocities." *Id*. at 35. He was also "not aware of a spraying process for any medical device that causes droplets to move at anything approaching" the speeds he assumed in his report (*i.e.*, 248 meters per second or 575 m.p.h.). *Id*. Indeed, as the Court found, Dr. Sojka's theory was "contrary to anything which can be measured and tested …." *Id*. at 38.

24.    Similarly, the Court found that MarcTec's expert on the ultimate issue of infringement, Dr. Christopher Batich, "relied upon Dr. Sojka's untested prediction to conclude that spraying somehow 'facilitates' the bonding" of one of the two polymers, PBMA, to Cypher. *Id*. at 36. As the Court explained, "MarcTec offered no evidence to support Dr. Batich's speculation that an increase in the temperature of polymer droplets that lasts only five millionths of a second – even if real – would allow PBMA to bond to the device." *Id*.

25.    In addition to relying on Dr. Sojka's untestable theory, Dr. Batich's opinion was also predicated on an assumption that PBMA would bond to the Cypher stent at $35^{\circ}C$. As this Court found, Dr. Batich based that assumption on an unrealistic experiment performed under "extreme experimental conditions unrelated to the actual manufacture of the Cypher stent …." *Id*.; *see also id*. at 49 ("Dr. Batich's testimony based on these extreme and unrealistic testing conditions is inadmissible as unreliable and irrelevant to the Cypher stent under *Daubert* and FRE 702."). Specifically, the Court determined that Dr. Batich "claim[ed] to have observed some adhesion at $35^{\circ}C$ when using a 2.3 kg weight that the PBMA in

Cypher is never subjected to." *Id*.  The Court found that Dr. Batich conducted this unrealistic experiment despite being "well aware" that Cypher is not subjected to such conditions and "would be destroyed if such a weight were placed on it." *Id*. at 48. The Court also determined that Dr. Batich "selected an unrealistically large contact area" for his experiment being "fully aware" that such a contact area was not present in Cypher and that an "unrealistically large contact surface area increased the likelihood of adhesion." *Id*.  MarcTec relied on the same experiment to argue that Cypher's polymers become flowable, tacky and adherent upon the application of heat during the manufacturing process.  The Court excluded all of these theories and experiments for not meeting the reliability and relevance requirements of *Daubert* and FRE 702.  *Id*. at 33-51.

## VII.   Summary Judgment of Noninfringement

26.   On June 15, 2009, this Court granted Cordis's motion for summary judgment of noninfringement with respect to all asserted claims of the patents-in-suit.  D.I. 178.  The Court also excluded expert opinions that MarcTec relied on to oppose Cordis's motion as discussed above.  *Id*.

## VIII.   The Cost of Cordis's Defense

27.   In defending against MarcTec's suit, Cordis incurred $3,873,865.01 in attorney fees and expenses primarily for work by its outside counsel, Patterson Belknap Webb & Tyler LLP and local counsel Thompson Coburn LLP.  D.I. 215 at 5; D.I. 201, Ex. A; D.I. 216.

28.    Cordis also incurred $809,788.02 in expert fees and expenses.  D.I. 215 at 5; D.I. 201, Ex. A.

29.    According to a 2007 American Intellectual Property Law Association ("AIPLA") survey, the average total cost of patent infringement litigation where more than $25 million is at risk (considering 419 respondents throughout the United States) was $5.5 million.  D.I. 201, Ex. A ¶¶ 15-16; D.I. 187, Ex. 2B at I-91, I-93. Cordis's total cost for defense of this action, including attorneys fees and expenses and expert fees, was approximately $1 million lower than this reported average even though Cordis's potential exposure – $168 million through October 2008, plus additional damages through 2011 – was substantially greater than $25 million.

30.    MarcTec does not specifically dispute the reasonableness of Cordis's attorney and expert fees and expenses in defending this case.  D.I. 205.

## CONCLUSIONS OF LAW

**I.    Legal Standard for Exceptional Case – 35 U.S.C. § 285**

31.    The patent statute authorizes courts "in exceptional cases" to award "reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  "The purpose of the statute has been described by [the Federal Circuit] as 'to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit.'" ***Automated Bus. Cos. v. NEC America, Inc.***, 202 F.3d 1353, 1355 (Fed. Cir. 2000) (quoting ***Central Soya Co., Inc. v. Geo. A. Hormel & Co.***, 723 F.2d 1573, 1578 (Fed. Cir. 1983)); ***see also Mathis v. Spears***, 857 F.2d 749, 753 (Fed. Cir.

**1988**).  "In addition, § 285 serves as a deterrent to 'improper bringing of clearly unwarranted suits' for patent infringement."  ***Automated*, 202 F.3d at 1355 (quoting *Mathis*, 857 F.2d at 754)**.

32.    "A number of different circumstances may support the finding of an exceptional case, including 'vexatious or unjustified litigation' or 'frivolous suit,' of which there must be clear and convincing evidence."  ***Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1387 (Fed. Cir. 2008) (quoting *Beckman Instrs. Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989)); *see also Yamanouchi Pharm. Co., Ltd., v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346-47 (Fed. Cir. 2000)**.  Courts consider the "totality of the circumstances" to determine whether a case is exceptional.  ***Yamanouchi*, 231 F.3d at 1347**.

33.    Bringing a "baseless or frivolous suit against an accused infringer . . . is a sufficient basis to require a district court to deem the case exceptional under § 285."  ***Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1367 (Fed. Cir. 2007); *see also Takeda*, 549 F.3d at 1387; *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 810-11 (Fed. Cir. 1990) (affirming a fee award where the patentee filed and pursued a patent suit without any reliable evidence of infringement)**.  Moreover, "[w]here . . . the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith . . . ."  ***Eltech*, 903 F.2d at 811**.

34.     MarcTec contends that subjective bad faith is needed to find a case exceptional under § 285.  D.I. 205 at 5.  That is not the law.  As discussed above, evidence that a plaintiff has "brought a baseless or frivolous suit . . . is a sufficient basis to require a district court to deem the case exceptional under § 285." ***Digeo, 505 F.3d at 1367***.

35.     In addition, for purposes of § 285, pursuing a "frivolous" lawsuit is treated as "bad faith" and is sufficient to support an award of fees under § 285. ***Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1329-30 (Fed. Cir. 2003); see Digeo, 505 F.3d at 1367 (same); Eltech, 903 F.2d at 811 (same); Takeda, 549 F.3d at 1388 (same)***.

36.     MarcTec also relies on the absence of a prior motion for sanctions under Rule 11, as a reason not to declare this case exceptional.  **FED. R. CIV. P. 11;** D.I. 205 at 5, 7.  Contrary to MarcTec's assertion, filing a Rule 11 motion is not a prerequisite for relief under § 285.  ***See Nilssen v. Osram Sylvania, Inc., 528 F.3d 1352, 1359-60 (Fed. Cir. 2008) (affirming fee award under § 285 without any indication that the movant had sought Rule 11 sanctions); Takeda, 549 F.3d at 1391 (same); Mathis, 857 F.2d at 751 (same)***.

## II.    Awarding Reasonable Attorney Fees and Expenses

37.    If a case is found "exceptional" under § 285, the decision to award attorney fees is "within the discretion of the trial judge ...."  **Takeda, 549 F.3d at 1385**.  "The methodology of assessing a reasonable award under 35 U.S.C. § 285 is [also] within the discretion of the district court."  **Automated, 202 F.3d at 1355**.

38.    "[T]he most critical factor" in determining the amount of a fee award "is the degree of success obtained."  **Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)**.  "Where . . . a prevailing party 'has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation . . . .'"  **Mathis, 857 F.2d at 755 (quoting Hensley, 461 U.S. at 435)**.

39.    A court need not reach every issue in a case to award all of its fees in defending the action.  **Id. at 756**.  "The result is what matters."  **Id. (quoting Hensley, 461 U.S. at 435)**.  The plaintiff "should be charged with the expense of defending against [a] frivolous lawsuit":

> [Plaintiff] argues that the district court should have parsed out the charges for fees incurred in the presentation of the on-sale bar defense, from all other fees [Defendant] incurred in defense of this lawsuit.  We cannot agree.  [Defendant] would not have incurred any of the fees generated in defense of this suit had [Plaintiff] not committed inequitable conduct in pursuit of its patent and had it not filed a claim for infringement of that patent, known by [Plaintiff] to have been improperly obtained.  Thus, [Plaintiff] should be charged with the expense of defending against this frivolous lawsuit.

***Brasseler, U.S.A., L.P. v. Stryker Sales Corp.***, 267 F.3d 1370, 1386 (**Fed. Cir. 2001**).

40.     An award of attorney fees may include the reasonable attorney fees expended on attorney fee award issues. **7 CHISUM ON PATENTS, § 20.03[4][c][vii][D] ("Courts award attorney fees for attorney time spent on attorney fee award issues.");** ***Mathis v. Hydro Air Indus. Inc.***, **1 U.S.P.Q. 2d 1513, 1532 (C.D. Cal. 1986),** *aff'd*, **857 F.2d 749 ("It is proper to include in the award of attorney's fees the attorney time expended in connection with the Defendants' claim for attorney's fees.");** ***Howes v. Med. Components, Inc.***, **761 F. Supp. 1193, 1200-01 (E.D. Pa. 1990) (awarding time spent by attorneys and paralegals on fee petition)**.

41.     "The purpose of § 285 is, in a proper case and in the discretion of the trial judge, to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit." ***Central Soya***, **723 F.2d at 1578.**  In addition to attorney fees, disbursements and expenses incurred in defending a case are also recoverable. ***Takeda***, **549 F.3d at 1391;** ***Automated***, **202 F.3d at 1356,** ***Mathis***, **857 F.2d at 751 (all affirming award of full attorney fees and related expenses).** Recoverable expenses include: separate expenses actually billed for secretaries and paralegals, **Mathis, 857 F.2d at 759**, lodging expenses, ***id.***, other disbursements in connection with the legal services rendered, ***Mathis***, **1 U.S.P.Q. 2d at 1531-32,** *aff'd*, **857 F.2d 749**, and post-judgment interest, ***Fox Indus., Inc. v. Structural Pres. Sys., Inc.***, **922 F.2d 801, 804 (Fed. Cir. 1990)**.

III.    **Expert Fee Awards**

42.    Expert fees and expenses are also recoverable.  Although they cannot be awarded under § 285, "a district court may invoke its inherent power to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute." ***Takeda*, 549 F.3d at 1391**.  A district court is "entitled to use its inherent power" to award expert fees "in cases involving bad faith." ***Id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991))**.  Indeed, "full expert witness fees have been awarded, without specific statutory authorization, upon a finding of bad faith." ***Takeda*, 549 F.3d at 1391 (quoting *Mathis*, 857 F.2d at 759)**.

IV.    **This Case is Exceptional Under 35 U.S.C. § 285: MarcTec Brought a Baseless Suit**

43.    The written description and prosecution histories of the patents-in-suit, and other documentary evidence, demonstrate that MarcTec's patent infringement case was baseless.  As this Court has held, "the patents-in-suit are unrelated to stents." D.I. 175 at 8; see also id. at 4-5.  As this Court found, Dr. Bonutti told the PTO that his claimed invention "did not include intraluminal grafts (i.e., stents), and, further, that his invention is directed to devices for use in surgical applications, in contrast to Dr. Palmaz's balloon-expandable stent, which is not a surgical device." D.I. 178 at 5.  With Dr. Bonutti having represented to the PTO that the claims exclude stents in order to obtain allowance, MarcTec cannot turn around in litigation and assert the patents-in-suit against the Cypher stent. ***Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003)**.

44.     Moreover, the patents-in-suit require bonding by the application of heat and documentary evidence establishes that heat bonding is not used in the manufacture of Cypher.  As this Court has found, "[t]here is no disclosure in the specification of any bonding other than through the direct application of heat."  D.I. 175 at 5.  "The specification does not discuss or disclose solution casting – the method by which the polymers on the Cypher stent are applied.  The only bonding that the specification teaches is heat bonding."  Id. at 8.  Moreover, as this Court found, in order to obtain allowance, Dr. Bonutti expressly and clearly "disclaimed devices in which a material is bonded to the device other than by the application of heat."  Id. at 10.

45.     Documents that Cordis produced in discovery established that Cordis uses solution casting, not heat bonding, to apply polymers to the Cypher stent.  See D.I. 178 at 11-16.  In fact, this Court found that under Cypher's manufacturing conditions, "it is not scientifically possible for the polymers in Cypher to be bonded to the Cypher stent by the application of heat …."  Id. at 16.  MarcTec nonetheless continued to press its case.  **Eltech, 903 F.2d at 810-11 (affirming a finding of exceptional case where the patentee filed and pursued a patent suit without any reliable evidence of infringement)**.

46.     MarcTec contends that filing and litigating a baseless or frivolous lawsuit is not sufficient to make a case exceptional under § 285 absent subjective bad faith.  D.I. 205 at 5.  That is not correct.  As discussed above, evidence that a plaintiff has

"brought a baseless or frivolous suit ... is a sufficient basis to require a district court to deem the case exceptional under § 285." ***Digeo***, **505 F.3d at 1367;** ***see also Takeda***, **549 F.3d at 1387**.

47.     Moreover, even after MarcTec had documentary evidence establishing that heat bonding – which Dr. Bonutti told the Patent Office is required – is not used in the Cypher manufacturing process and Cordis moved for summary judgment of noninfringement on that ground, MarcTec pursued its frivolous action by relying on mischaracterizations of the claim construction adopted by this Court and expert testimony that did not meet the requirements for scientific reliability or relevance required by FRE 702 and Daubert.  "Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith . . . ." ***Eltech***, **903 F.2d at 811**.

## V.     Cordis Is Entitled To Its Reasonable Attorney Fees and Expenses

48.     This case is exceptional under § 285, and MarcTec accordingly should pay Cordis's reasonable attorney fees and expenses.  Cordis obtained summary judgment of noninfringement of every asserted claim and is entitled to "recover a fully compensatory fee" for its defense of this action. ***Mathis***, **857 F.2d at 755; Hensley, 461 U.S. at 435.**  Cordis "would not have incurred any of the fees generated in defense of this suit" if MarcTec did not bring and maintain its baseless patent infringement suit. ***Brasseler***, **267 F.3d at 1386**.  It is therefore entitled to all fees incurred in defending against MarcTec's suit.

49.    Cordis is entitled to complete compensation for the amount it expended in defending this exceptional case, including not only its reasonable attorney fees, but also its reasonable disbursements and expenses for the prudent defense of the case. **Takeda, 549 F.3d at 1391; Automated, 202 F.3d at 1356, Mathis, 857 F.2d at 751 (all affirming award of full attorney fees and related expenses)**.

50.    MarcTec does not specifically dispute the reasonableness of Cordis's attorney fees and expenses in defending this case.  D.I. 205.  Moreover, a number of other indicia reflect the reasonableness of Cordis's attorney fees and expenses.  The fees and expenses incurred by Cordis were reasonable in light of the scope of patent litigation, the magnitude of the damages sought by MarcTec and MarcTec's litigation misconduct.  In addition, the rates charged by Cordis's attorneys were comparable to the rates charged by other firms in a typical patent infringement action involving a major commercial product, D.I. 188.  **Mathis, 857 F.2d at 755-756 (explaining that the "customary fee [is] a factor to guide determination of 'reasonable attorney's fee'")**.

51.    Moreover, the total attorney fees and expenses incurred by Cordis is reasonable considering Cordis's potential exposure of hundreds of millions of dollars in this case.  D.I. 187 Ex. 2B (2007 AIPLA Survey) at I-91, I-93 (average total cost of patent infringement litigation where more than $25 million is at risk was $5.5 million).  **Mathis, 857 F.2d at 755-56 (holding that reliance on AIPLA surveys is proper)**.  It is also reasonable in comparison to the fees awarded in other patent

actions. *See, e.g, Takeda*, **549 F.3d at 1390-91 (affirming an award of $16.8 million in attorney and expert fees and expenses in a litigation that lasted only two years);** *Nilssen v. Osram Sylvania, Inc.*, **No. 01 Civ. 03585 (N.D. Ill. April 3, 2007) (awarding defendant $5.6 million in attorney fees; the award of fees was affirmed on appeal, 528 F.3d 1352, 1359-60 (Fed. Cir. 2008));** *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, **No. 8:04-cv-689, 2007 WL 6137002 (C.D. Cal. June 28, 2007) (awarding defendant $4.7 million in attorney fees and expenses; the award was affirmed on appeal, 558 F.3d at 1380-81)**.

52.    In sum, the attorney fees and expenses that Cordis incurred in defending against MarcTec's suit are reasonable for the reasons discussed above. MarcTec does not dispute that the amount that Cordis had to expend in defending this action was reasonable.  Cordis would not have incurred any of these costs but for MarcTec's unwarranted suit. Accordingly, the Court awards Cordis the requested $3,873,865.01 in attorney fees and expenses under 35 U.S.C. § 285.

**VI.    Awarding Expert Fees and Expenses**

53.    Expert fees are recoverable in patent cases where, as here, there was bad faith, such as the filing of a frivolous action.  *Takeda*, **549 F.3d at 1391 (awarding full expert fees);** *Mathis*, **857 F.2d at 759 (same)**.

54.    MarcTec does not specifically dispute the reasonableness of Cordis's expert fees and expenses.  D.I. 205.

55.     Because of MarcTec's bad faith in bringing and pressing this suit when it had no basis for asserting infringement, Cordis is awarded its expert fees of $809,788.02 (D.I. 215 at 5; D.I. 201, Ex. A) in the exercise of this Court's inherent power.  ***Chambers*, 501 U.S. at 46**.

For the reasons set forth above, the Court finds this case exceptional under 35 U.S.C. § 285, and as such, hereby **GRANTS** Defendants' Motion to Declare This Case Exceptional and Award Their Reasonable Attorney and Expert Fees (Doc. 201).  Accordingly, the Court hereby awards Cordis its reasonable attorney fees and expenses in the amount of $3,873,865.01 and its expert fees and expenses of $809,788.02, for a total of **$4,683,653.03**.

**IT IS SO ORDERED**.

Signed this 23rd day of February, 2010.

/s/  *David R Herndon*

**Chief Judge**
**United States District Court**